# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HABITAT EDUCATION CENTER, INC., et al,**
        **Plaintiffs,**

      **v.**                            **Case No. 07-C-0578**

**UNITED STATES FOREST SERVICE, et al.,**
        **Defendants.**

---

## DECISION AND ORDER

Plaintiffs filed the present action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, arguing that in approving a project (the "Twentymile" project) in the Chequamegon-Nicolet National Forest ("CNNF"), the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 –1687. Before the court are the parties' cross-motions for summary judgment.

## I. BACKGROUND

The CNNF covers approximately 1.5 million acres in northern Wisconsin, where between the mid-nineteenth century and the Great Depression timber barons and forest fires reduced Wisconsin's old-growth forests to "brush fields, eroded fallow pastures, and burned-over stump patches that drew the eye to the horizon and beyond." History of the Chequamegon-Nicolet National Forests (hereinafter "History of CNNF") at 2-4, available at http://www.fs.fed.us/r9/cnnf/general/history/detailed_history.pdf (last visited Jan. 12, 2009). After the timber barons denuded the forest, speculators sold what remained as farmland. The land was unproductive, however, and the farmers could not earn enough to pay their property

taxes, causing them to abandon their lands or forfeit them to county governments.  Id. at 3; R. 8401, at 2.[1]

In the late 1920s, the federal government began purchasing the abandoned land and managing it as a national forest.  During the Great Depression, the Civilian Conservation Corp planted thousands of acres of pine throughout the barren farmland.  R. 8401, at 2.  In 1933, the government's collective purchases were designated as the Nicolet National Forest.  Because the national forest emerged from the government's purchases of individual tracts of land and was not carved from large blocks of public land, it had a fragmented ownership pattern, characterized by a patchwork of public and private lands.  History of CNNF at 4.  In 1933, these lands were aggregated into two, noncontiguous units, the Nicolet East and Nicolet West.  The Nicolet West eventually became the Chequamegon National Forest.  For sixty years, the Forest Service managed the Nicolet and Chequamegon units as separate national forests.  Since 1993, however, the units have been managed as a single entity, now known as the Chequamegon-Nicolet National Forest.  Id.  Although the amount of national forest land has grown over the years, the Nicolet and Chequamegon units remain noncontiguous.  The Nicolet unit is located on the eastern half of northern Wisconsin, east of Rhinelander, and the Chequamegon is located on the western half of northern Wisconsin, near Park Falls.[2]

As a result of the Forest Service's management of the CNNF, the land has returned to forest conditions, although it is now a young forest characterized by even-aged stands (i.e.,

_____

[1]Materials in the administrative record will be cited by Bates number as R. _____.  Some multi-page documents bear only one Bates number, located on the cover page.  Thus, multi-page documents will be cited by Bates number, with a pinpoint citation to the relevant page number.

[2]A map showing the location of the two units is available at the CNNF website, http://www.fs.fed.us/r9/cnnf/general/onlinemap/index.html (last visited Jan. 12, 2009).

trees that are roughly the same age). R. 8401, at 2. While this is an improvement over the conditions left by the timber barons, a truly healthy forest contains trees of different ages, as well as a variety of tree species. Id. Thus, one of the Forest Service's objectives in managing the forest is to encourage a diversity of tree species and a diversity of tree ages throughout the CNNF. Id. One of the tools that the Forest Service uses to further this objective is selective timber harvesting through restoration projects, such as the project that is the object of this litigation. Id. When selected trees are harvested from an even-aged stand, the stand becomes more diverse over time, as younger trees replace the harvested trees and compliment the older trees that were left in the stand.[3] Thus, restoration projects further not only the economic interests of those who benefit from forest commodities, but also the objective of forest diversity. Id. at 2-3.

On February 12, 2007, Anne F. Archie, the Forest Supervisor for the CNNF, issued a Record of Decision ("ROD") in which she approved the Twentymile project, a restoration project that has a number of goals, including the promotion of forest diversity and the provision of forest commodities. Because the Twentymile project was a "major Federal action[] significantly affecting the quality of the human environment," NEPA required the Forest Service to prepare an Environmental Impact Statement ("EIS") for the project, which is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." See Highway J Citizens Group v. Mineta, 349 F.3d 938, 953 (7th Cir. 2003). The final version of the EIS for the Twentymile project was published in January 2007.[4]

---

[3]In addition to selective harvesting, the Forest Service allows some clear-cutting, in which all trees in an area are harvested.

[4]The Twentymile EIS is in the record at R. 8387. I will cite it as "EIS" and give the relevant page numbers.

The plaintiffs, environmental advocates, challenged the ROD approving the Twentymile project in administrative proceedings. After exhausting their administrative remedies, plaintiffs commenced this action, which is the fourth in a series of actions that plaintiffs have filed in this District against the Forest Service relating to their approval of restoration projects within the CNNF. In the previous three actions, I determined that the Forest Service did not fully comply with NEPA and enjoined the projects until such time as the Forest Service remedied their non-compliance. See Habitat Educ. Ctr. v. Bosworth, 381 F. Supp. 2d 842 (E.D. Wis. 2005) ("Habitat III"); Habitat Educ. Ctr. v. Bosworth, 363 F. Supp. 2d 1090 (E.D. Wis. 2005) ("Habitat II"); Habitat Educ. Ctr. v. Bosworth, 363 F. Supp. 2d 1070 (E.D. Wis. 2005) ("Habitat I"). Although the present action arises out of the same forest, involves some of the same species, and has some issues in common with the previous actions, the actions are otherwise unrelated. The project involved in the present case has its own administrative record, which I review independently of my decisions in the three earlier cases. See Habitat Educ. Ctr. v. Kimbell, 250 F.R.D. 390, 394-95 (E.D. Wis. 2008) (explaining that each project is distinct and must be reviewed independently and on its own administrative record).

In bringing this action, plaintiffs express concern about the Forest Service's management of three sensitive species that inhabit the CNNF: American Pine Marten, Northern Goshawk, and Red-shouldered Hawk. They argue that the Forest Service has not adequately analyzed the potential impact of the Twentymile project on the habitat of these species. A brief overview of these species and their habitat will help the reader understand the parties' positions in this case.[5]

─────────────────────

[5]My overview of sensitive species and their habitats is taken from the Biological Evaluation that the Forest Service prepared for the Twentymile project. R. 2068.

The American Pine Marten is a small, uncommon to rare member of the weasel family, similar in size to a small house cat or full-bodied mink. In the CNNF, pine marten are found primarily in northern hardwood dominated forests and prefer areas with large woody debris and large cavity trees, in which they can make dens. By 1925, logging and unfettered trapping had extirpated marten from Wisconsin. In 1979, as an effort to reintroduce the species, the Wisconsin Department of Natural Resources began releasing marten on both the Chequamegon and Nicolet sides of the CNNF. This reintroduction has met with only limited success, and marten remain a state endangered species.[6] Today, Wisconsin's marten populations are concentrated on lands within the CNNF.

The Northern Goshawk is a large, forest dwelling raptor (i.e., a bird of prey) that generally makes its habitat in mature deciduous conifer or mixed forest. The CNNF is at the southernmost edge of goshawks' breeding range. Because of this, goshawks are expected to occur in the CNNF in lower numbers and with higher variation than at the core of their range. Even before the timber barons, goshawks were considered rare summer residents. After the northern hardwoods were logged, the birds persisted in pockets of unharvested land. Research in the 1970s indicated that goshawks were becoming more common on the Nicolet side of the CNNF. Goshawks occur less frequently on the Chequamegon, where available research indicates a fluctuating population with no definitive trend.

The Red-shouldered Hawk is a medium-sized woodland hawk that summers in Wisconsin and migrates south during the fall. Prior to 1900, it was one of the most common

---

[6]Although Wisconsin's population of American Pine Marten is endangered, the species is abundant (or at least not endangered) in other areas of its range. See Twentymile Restoration Project Supplemental Information Report [Docket Entry # 31, attach. 1] at 2 ("[T]he marten is secure across its range, and even the total loss of the Chequamegon population would not result in listing range-wide.")

hawks in the eastern United States, but it has probably never been common in Wisconsin. Once again, logging in the late nineteenth and early twentieth centuries destroyed much of its habitat. As Wisconsin's forests recovered, the Red-shouldered Hawk returned, although it is still considered uncommon and is listed as a threatened species by the State of Wisconsin. The CNNF is at the northern edge of the Red-shouldered Hawk's breeding range.

## II. DISCUSSION

Plaintiffs argue that, pursuant to the APA, the Forest Service's decision to implement the Twentymile project must be set aside because the decision does not comply with NEPA and NFMA. For the reasons stated below, I decline to set aside the Forest Service's decision.

### A.    NEPA

#### 1.    Standard of Review.[7]

When an agency's decision is challenged under the APA based on the agency's failure to comply with NEPA, the standard of judicial review is a narrow one. <u>Highway J</u>, 349 F.3d at 952. The court is not empowered to examine whether the agency made the "right" decision, but only to determine whether, in making that decision, the agency followed the procedures prescribed by NEPA. <u>Id.</u> (NEPA "'does not mandate particular results, but simply prescribes the necessary process.'") In the present case, plaintiffs argue that the Forest Service did not comply with the procedures required by NEPA because it did not prepare a satisfactory EIS before approving the Twentymile project.

NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS

---

[7]In this section, I describe the general standards applicable to the review of an EIS. I note, however, that courts have stated more specific standards to govern certain specific issues. To the extent that more specific standards are applicable to any of plaintiffs' specific arguments, I will state them in the course of my discussion of the specific argument.

is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." Highway J, 349 F.3d at 953. Requiring an agency to prepare an EIS serves two purposes. First, "'[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" Dep't of Transp. v. Public Citizen, 541 U.S. 752, 768 (2004) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)) (alteration in original). Second, "it 'guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" Id. Thus, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." Simmons v. U.S. Army Corp of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). The EIS must show that agency officials have "[thought] through the consequences of – and alternatives to – their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id. Stated differently, the agency must demonstrate that it "has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).

Before proceeding further, it is important to identify the standards that a court must apply when determining whether an EIS satisfies NEPA. The Supreme Court and Seventh Circuit have stated that "the only role for a court [in the NEPA context] is to insure that the agency has taken a 'hard look' at environmental consequences." Kleppe, 427 U.S. at 410 n.21; Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n, 470 F.3d 676, 682 (7th Cir. 2006); Highway J, 349 F.3d at 953. However, "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 185 (4th Cir. 2005), and it is a standard that "is not susceptible to refined calibration,"

Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (internal quotation marks and citation omitted). Rather than apply a rigid standard, a court must make a "pragmatic judgment" as to whether the agency has fostered the two principal purposes of an EIS: "informed decision-making and informed public participation." Id.

In making its pragmatic judgment, a court must be careful not to "'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon Soc'y, 422 F.3d at 186. With a document as complicated and mired in technical detail as an EIS, it will always be possible to point out some potential defect or shortcoming, or to suggest some additional step that the agency could have taken to improve its environmental analysis. An EIS is unlikely to be perfect, and setting aside an EIS based on minor flaws that have little or no impact on informed decision-making or informed public participation would defy common sense. Thus, rather than getting bogged down in possible technical flaws, a court must "take a holistic view of what the agency has done to assess environmental impact." Id. Further, courts must remember that it is the agency, and not the court, that has the technical expertise required to perform the environmental analysis in the first place. This means that judicial review of an EIS must be deferential, especially when it comes to the scientific and technical details that make up the heart of the analysis. Citizens for Alternatives to Radioactive Dumping v. Dep't of Energy, 485 F.3d 1091, 1098 (10th Cir. 2007) (judicial deference is "especially strong" where decision involves technical or scientific matters within agency's area of expertise). Of course, deferential review does not mean no review, and courts must ensure that agencies carry out their duties under NEPA, make reasoned choices, and provide a discussion that fully and frankly explains the environmental consequences of a proposed action. However, to strike a proper balance between deference and a "searching and careful" inquiry, Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989), a court

may invalidate an EIS only if, after first learning what is going on so that it does not decide on the basis of superficial beliefs and assumptions, the court is firmly convinced that an error or omission in the EIS has defeated the goals of informed decision-making and informed public participation.  Cf. Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 803 (7th Cir. 1987).  Again, this standard of review is not precise, but requires that the court exercise good judgment.[8]

In the present case, plaintiffs argue that the Twentymile EIS contains a laundry list of defects.  I discuss each alleged defect below.  Before proceeding to an analysis of the specific defects, however, I must point out that plaintiffs' critique of the EIS is much closer to flyspecking than holistic analysis.  Plaintiffs have identified a host of technical issues, but have painted no overall picture that leaves me with the firm conviction that the EIS has not adequately fostered informed decision-making and informed public participation.  My own review of the EIS and the relevant excerpts from the administrative record indicates that the Forest Service conducted an adequate analysis.  Although the EIS is not perfect in all respects, I find that it is adequate to inform decision-makers and the public about the significant environmental issues surrounding the Twentymile project.

With these general observations in mind, I turn to plaintiffs' specific arguments.

---

[8]Some courts have described this standard as applying a "rule of reason," under which the court asks "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."  See, e.g., Churchill County, 276 F.3d at 1071 (internal quotation marks and citation omitted); see also Ecology Ctr., Inc. v. United States Forest Service, 451 F.3d 1183, 1189-90 (10th Cir. 2006) ("We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.").

-9-

##	2.	Analysis of Reasonable Alternatives.

An EIS must discuss alternatives to a proposed action. 42 U.S.C. § 4332(c)(iii). The regulations promulgated by the Council on Environmental Quality ("CEQ")[9] specify that the agency preparing an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Plaintiffs argue that the Forest Service failed to rigorously explore and objectively evaluate their proposed alternative. The Forest Service responds that it was not required to do so because it briefly discussed the reasons for eliminating the proposal from detailed study.

When evaluating alternatives to a proposed action, an agency must answer three questions in order. First, what is the purpose of the proposed project? Second, given that purpose, what are the reasonable alternatives to the project? And third, to what extent should the agency explore each particular alternative? Simmons, 120 F.3d at 668. These are questions for the agency to resolve in the first instance, and a court owes deference to the agency on whether the agency answered the questions in a permissible way. Id. at 668-69. The court's only role is to ensure that the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision. Id. at 669.

Under the Simmons framework, I start by examining the way in which the Forest Service identified the purposes of the Twentymile project. The EIS explains the Forest Service's purposes in detail. EIS at 1-6 to 1-15. The general purpose is to bring the Twentymile area closer to the long-term goals identified in the 2004 Forest Plan for the

---

[9]NEPA established CEQ as an agency within the Executive Office of the President. It "coordinates federal environmental efforts and works closely with agencies and other White House offices in the development of environmental policies and initiatives." See http://www.whitehouse.gov/ceq/aboutceq.html (last visited Jan. 12, 2009).

CNNF.[10]  The Forest Service studied the project area and identified discrepancies between the area's current condition and the desired condition as described in the Plan.  Id. at p. 1-1. The Forest Service then formulated seven specific objectives to address some of the discrepancies: (1) restoring northern hardwood forests to an uneven-aged condition; (2) improving the landscape pattern of northern hardwoods; (3) reducing aspen within cold-water stream corridors; (4) improving upland forest type composition; (5) balancing the age class distribution of aspen; (6) promoting healthy forests and providing forest commodities; and (7) providing a safe, efficient and effective transportation system.[11]  Notably, plaintiffs raise no objections to the way that the Forest Service defined these objectives.  Thus, I find that the Forest Service complied with NEPA when identifying the purposes of the Twentymile project.[12]

The next step of the Simmons framework is to identify the reasonable alternatives that will satisfy the project's purposes.  The Forest Service prepared an EIS that analyzed four alternative means to achieving the Twentymile project's objectives – three action alternatives and one "no action" alternative.[13]  Id. at 2-1 to 2-34.  In addition to these four alternatives, which the Forest Service studied in detail, the Forest Service briefly discussed four other

_____

[10]The Forest Plan is a document that the Forest Service prepared in accordance with NFMA, and its purpose is to provide overall management direction for the CNNF.

[11]The EIS explains how each objective is designed to bring the project area closer to its desired future condition.  EIS at 1-6 to 1-15.

[12]Because the Forest Service studied the project area before formulating the project's objectives, this case is distinguishable from Simmons, in which the Seventh Circuit admonished an agency for uncritically accepting a project objective from a permit applicant. 120 F.3d at 669.

[13]As the name implies, the "no action" alternative is the status quo.  The CEQ regulations require that the agency always study a no action alternative.  40 C.F.R. §1502.14(d).

alternatives, including plaintiffs' proposal, that were eliminated from detailed study. Id. at 2-17 to 2-24.[14]

The Forest Service excluded plaintiffs' proposal from detailed study under the second and third steps of the Simmons framework – that is, because it was not a project that satisfied the project's purposes as defined in step one, and because it suggested unnecessary measures and included components that were already incorporated into the other alternatives that the Forest Service studied in detail. The EIS contains almost four, single-spaced pages devoted to a point-by-point evaluation of plaintiffs' proposal and an explanation of its rationale for excluding it from detailed study. Id. at 2-20 to 2-24. I find that this discussion is adequate to satisfy the Forest Service's obligation to briefly discuss any alternatives that it eliminated from detailed study pursuant to 40 C.F.R. § 1502.14(a).

Plaintiffs argue that the Forest Service eliminated its proposal from detailed study in order to maximize timber production. However, the EIS gives a variety of reasons for eliminating the proposal, only one of which relates to logging, id. at 2-22 to 2-23 (response to Component 4a). In any event, even if the Forest Service eliminated plaintiffs' proposal from detailed study solely because of the proposal's impact on timber production, the EIS would be sufficient. This is because, as the EIS explains, plaintiffs' proposal would have reduced timber production by 70%, made logging the remaining 30% difficult, and resulted in unacceptable damage to trees that were not harvested – in other words, plaintiffs' proposal would have made a responsible timber harvest impossible. Id. (explaining that under plaintiffs' proposal, "commercial timber harvest would not be economically feasible, on the ground equipment operability would be very difficult, and unacceptable resource damage to

---

[14]Plaintiffs' proposal is located at R. 8412.

residual trees would occur").  Yet, improving the health of the forest through responsible timber harvesting is one of the project's purposes.  Id. at 1-12 to 1-13.  Because plaintiffs' proposal would not have satisfied this purpose, it was not a "reasonable" alternative entitled to detailed evaluation.  Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1041 (10th Cir. 2001) ("[NEPA] requires only that reasonable alternatives be evaluated.  Alternatives that do no accomplish the purpose of an action are not reasonable."); Simmons, 120 F.3d at 669 ("It is axiomatic that [an agency] need not examine every conceivable alternative.  Identifying, assessing and comparing alternatives costs time and money, and an agency should focus its energies only on the potentially feasible, not the unworkable.").[15]

Plaintiffs also argue that even if the Forest Service gave adequate reasons for rejecting their proposed alternative, the Forest Service was still required to study a range of reasonable alternatives, and that the Forest Service failed to do so by studying only alternatives that yielded about the same amount of timber products and the "no action" alternative.  This argument is based on the fact that the three "action" alternatives that the Forest Service studied in detail all yield between 41 and 43 million board feet ("MMBF") of forest product.  Plaintiffs argue that it is never permissible to study only alternatives that yield about the same amount of timber, and that the Forest Service was required to study a wider range of alternatives.

To begin with, a serious flaw in plaintiffs' argument is that it focuses on only one purpose of the Twentymile project – timber production.  But as I have explained, the

_____

[15]In Simmons, the Seventh Circuit determined that any agency's evaluation of alternatives was inadequate because it did not examine a seemingly reasonable alternative at all.  120 F.3d at 669.  The present case is different than Simmons because the Forest Service has explained why plaintiffs' alternative is not reasonable and therefore has justified its failure to study the alternative in detail.

Twentymile project has seven objectives, only one of which relates to timber. When identifying reasonable alternatives, the Forest Service had to balance all seven of these factors. Thus, the Forest Service did not begin its identification of alternatives by arbitrarily selecting alternatives that resulted in various amounts of timber – such as, 0 MMBF, 10 MMBF, 20MMBF, and so on. Rather, it began with the seven project objectives and looked for alternative ways of accomplishing those goals. The fact that the three action alternatives all produce similar amounts of timber does not mean that the Forest Service has not considered all reasonable alternatives. Instead, the similar yields could simply show that any alternative that satisfies the project's seven objectives will result in a timber harvest yielding between 41 and 43 MMBF.[16]

Moreover, the Forest Service did consider alternatives resulting in less logging, such as the "no action" alternative and plaintiffs' proposal, which proposed an amount of logging between 41 MMBF and the "no action" alternative. As indicated, the Forest Service gave a thorough explanation for excluding plaintiffs' alternative from detailed study, part of which was that, under plaintiffs' proposal, "commercial timber harvest would not be economically feasible, on the ground equipment operability would be very difficult, and unacceptable resource damage to residual trees would occur." EIS at 2-22 to 2-23. Plaintiffs have not shown that this explanation is inadequate, arbitrary or capricious. Nor have plaintiffs shown that the Forest Service could have formulated a satisfactory alternative that resulted in fewer

---

[16]It is not implausible to think that any reasonable alternative will result in similar timber yields. The EIS explains that a minimum number of trees must be removed in order to make any harvest economically viable. EIS at 2-22 (last full paragraph). Further, one of the major purposes of the project is to remove a substantial number of trees so that new, younger trees can begin to grow and improve the forest's age diversity. See generally id. at 1-6 to 1-12. These goals would seem to create a "floor" on timber harvesting beneath which the project is no longer viable. In any event, as explained in the text, plaintiffs have not shown that any alternative resulting in fewer than 41 MMBF would be a reasonable alternative.

than 41 MMBF of forest commodities. Plaintiffs simply argue that the Forest Service must study a wider range of alternatives, whether or not they serve the project's purposes. However, that is not what NEPA requires. Custer County, 256 F.3d at 1041, Simmons, 120 F.3d at 669. Thus, because plaintiff has not shown that an action alternative yielding less that 41 MMBF of timber would have satisfied the purposes of the Twentymile project, and because the Forest Service has adequately explained why such an alternative would not satisfy the project's purposes, I cannot say that the Forest Service violated NEPA by failing to study all reasonable alternatives.

### 3. Analysis of Cumulative Impacts.

The CEQ regulations require that an EIS include a discussion of environmental impacts, including impacts that are direct, indirect and cumulative. 40 C.F.R. § 1508.25. "Cumulative impact" is:

> the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. A proper cumulative impacts analysis will assess the proposed action in light of other activity that has affected or will affect the same environmental resources. The goal is to highlight any environmental degradation that might occur if the minor effects of multiple actions accumulate over time. For example, although a single forest project might have minimal environmental consequences, combining that project with those that preceded it and others that are anticipated might reveal a more serious overall impact. Placing the project into a broader context that includes these recent and anticipated projects helps prevent "the tyranny of small decisions." Council on Environmental Quality, Considering

Cumulative Effects Under the National Environmental Policy Act 1 (January 1997), available at http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa.htm (last viewed Jan. 12, 2009).

With respect to the Forest Service's cumulative impacts analysis, plaintiffs allege: (1) that the Forest Service unreasonably determined the geographic area in which to conduct the analysis; (2) that the Forest Service failed to analyze the cumulative impacts in sufficient detail; and (3) that the Forest Service failed to analyze the cumulative impacts of old-age aspen clear-cutting and harvesting in specific areas of the forest. I address these contentions below.

### a. Selection of geographic area to be analyzed for cumulative impacts.

One of the first steps in any cumulative effects analysis is to identify the geographic boundaries in which cumulative effects will be measured. Identifying such boundaries "is a task assigned to the special competency of the appropriate agencies." Kleppe, 427 U.S. at 414; see also Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) (deferring to agency's determination of the scope of its cumulative impact review). Nevertheless, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002). "An agency must provide support for its choice of analysis area and must show that it considered the relevant factors." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 902 (9th Cir. 2002). Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003). The presence of species habitat outside the project area is also a relevant consideration in determining the geographic scope of a cumulative impacts analysis. CEQ, supra, at 15. However, "[i]t is not practical to analyze the cumulative effects of an action on the universe"; instead, the analysis must be limited to a meaningful geographic

area.  Id. at 8.  Thus, "the boundaries for evaluating cumulative effects should be expanded to the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties."  Id.

In the present case, the affected resources are the sensitive species within the CNNF – American Pine Marten, Northern Goshawk, and Red-shouldered Hawk.  The EIS discusses the cumulative impacts of past, present and reasonably foreseeable forest projects on these three species.  EIS at 3-83 to 3-99.  For each species, the EIS identifies the boundary of the cumulative impacts analysis and explains why the Forest Service selected that boundary.  Id. at 3-87, 3-93 & 3-98.  Although the boundary is different for each species, all three boundaries completely exclude the Nicolet side of the forest.  Plaintiffs argue that because these three species reside in both the Chequamegon and Nicolet sides, the Forest Service's failure to include the Nicolet side in its cumulative impacts analysis was arbitrary.

I conclude that the Forest Service's decision was not arbitrary.  As the EIS explains, the available scientific evidence indicates that the populations of marten, goshawk, and red-shouldered hawk on the Chequamegon side do not interact with the populations on the Nicolet side.  Id. at 3-87, 3-93 & 3-98.  The populations do not encounter each other, interbreed, compete for resources, or eat each other.  Id. at H-25.  "Put another way, the complete loss of [the population] on the Chequamegon would have no impact on the viability of [the population] on the Nicolet."  Id.  For this reason, a project conducted within the Chequamegon would have little, if any, effect on populations within the Nicolet, and vice versa.  Therefore, a discussion of projects affecting Nicolet populations would be of little, if any, interest to a reader studying the environmental effects of a project conducted on the Chequamegon side.  Such a reader would not care about the status of Nicolet populations any more than he or she would care about populations in Michigan, Manitoba, or elsewhere

in the world.  Accordingly, the Forest Service had sound reasons for limiting the geographic scope of its cumulative impacts analysis to the Chequamegon side of the forest.

Plaintiffs point out that when the Forest Service studied the cumulative impacts of the Twentymile project on some species, such as Bald Eagle, Swainson's Thrush, Spruce Grouse, and Black-backed Woodpecker, it expanded the geographic scope to include both the Chequamegon and Nicolet units.  Plaintiffs argue that the Forest Service has drawn an arbitrary line between the species that it discussed on a forest-wide basis and those that it discussed using a narrower geographic scope.  But the Forest Service gives a reasoned explanation for its distinction, which is based on the amount of available information concerning each species.  Id. at H-25 to H-26.  The Forest Service had only limited information about the degree to which populations of species such as Swainson's Thrush interact.  In contrast, it had much more information about interaction between populations of marten, goshawk and red-shouldered hawk.  The available information about the latter species enabled the Forest Service to reasonably conclude that the Chequamegon and Nicolet populations do not interact.  But because of the limited information about species such as Swainson's Thrush, the Forest Service decided to be conservative and assume that they did interact.  Thus, the Forest Service had valid reasons for applying different geographic boundaries for each species.

Finally, I recognize that in my past decisions regarding projects within the CNNF, I found that the Forest Service violated NEPA by failing to discuss cumulative impacts on populations of marten, goshawk, and red-shouldered hawk throughout the entire CNNF. Habitat I, 363 F. Supp. 2d at 1077-78; Habitat II, 363 F. Supp. 2d at 1097-99; Habitat III, 381 F. Supp. 2d at 849-50.  However, in those cases, the Forest Service had not given a reasoned explanation for limiting the scope of its cumulative impacts analysis to selected

regions within the forest.  In the present case, the Forest Service has given an adequate explanation for the geographic boundaries that it chose, and therefore it has satisfied NEPA.

**b.      Discussion of past, present and reasonably foreseeable projects within forest and on private land.**

Plaintiffs next argue that the Forest Service did not adequately discuss the cumulative impacts of past, present and reasonably foreseeable projects on American Pine Marten, Northern Goshawk, and Red-shouldered Hawk.  They make three arguments: (1) the Forest Service failed to properly catalogue the past actions that it considered; (2) the Forest Service failed to fully discuss contemporaneous and anticipated projects; and (3) the Forest Service failed to properly account for projects on private land.

In the discussion that follows, the reader should note that the relevant cumulative effect is the effect of past, present and future forest projects on the <u>habitat</u> for each sensitive species.  The Forest Service identified impact to habitat as an issue during the "scoping" phase of the project, <u>see</u> EIS at 1-18 to 1-19 (explaining how environmental issues were identified), and plaintiffs indicated at oral argument that the only cumulative effect they are concerned with is effect on habitat.

**(i)      Discussion of past projects.**

In 2005, CEQ issued a memorandum containing guidance on the consideration of past actions in a cumulative effects analysis.  <u>See</u> Memorandum from James L. Connaughton, Chairman, CEQ, to Heads of Federal Agencies (June 24, 2005) (available at http://ceq.hss.doe.gov/nepa/regs/guidance.html (last visited Jan. 12, 2009).[17]    The

---

[17]CEQ's interpretation of NEPA is entitled to deference, <u>Andrus v. Sierra Club</u>, 442 U.S. 347, 358 (1979), and plaintiffs do not argue that the guidance memorandum incorrectly interprets NEPA or is otherwise an improper source of authority.  Moreover, the Ninth Circuit has recently held that this exact memorandum was entitled to deference.  <u>See</u> <u>League of Wilderness Defenders v. United States Forest Service</u>, __ F.3d __, 2008 WL 5171345, at *5

memorandum explains that an adequate cumulative effects analysis will provide "analysis and a concise description of the identifiable present effects of past actions to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, additive and significant relationship to [the present effects of past actions]." Id. at 1. That is, an agency must not consider the environmental effects of a proposal in a vacuum but must explain them in light of the present effects of past actions. This does not mean that the agency must catalogue and analyze every past project that impacted the project site. Rather, what is important is the present effects of past actions, and thus "agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of past actions." Id. at 2. The amount of detail in which past actions must be discussed is a matter that is left to the agency's discretion. Id. at 1. When considering the appropriate level of detail, it helps to remember the purpose of a cumulative impacts analysis, which is to raise awareness of the possibility that numerous small environmental impacts will accumulate and result in a more serious overall effect over time.

Plaintiffs contend that the Forest Service discussed past projects affecting sensitive species within the Twentymile area in insufficient detail. However, the EIS contains enough information about past actions and their impact on sensitive species to enable a decision-maker to evaluate the Twentymile project and its alternatives in light of the present effects of past actions. The EIS contains detailed information about each affected species, its habitat, the present condition of such habitat, the effects of past actions on such habitat, and how the proposal and its alternatives will impact such habitat. EIS at 3-83 to 3-99 & H-23 to H-24.

_____

(9th Cir. Dec. 11, 2008).

The EIS contains an entire section describing past actions affecting marten, goshawk, and red-shouldered hawk. Id. at 3-92 to 3-93. For each species, the Forest Service included a table expressing the percentage of available habitat within the cumulative effects area that will be available depending on which alternative is implemented. Id. at 3-86, 3-91 & 3-97.[18] These tables account for, and allow a side-by-side comparison of, the cumulative effects of past, present and reasonably foreseeable projects on each species's habitat. For example, a reader interested in cumulative effects on marten can refer to Table 3.10-1[19] and discover that under the proposed alternative, suitable habitat for marten within the cumulative effects region will increase by 8.2% over 10 years. The reader can obtain similar information for the other alternatives, including the "no action" alternative. Thus, any decision-maker or member of the public reading the EIS can get a sense of the project's overall impact on sensitive species in light of the present effects of past forest projects.

Although the EIS contains enough information to enable a decision-maker or member of the public to evaluate the proposal and its alternatives in light of the present effects of past actions, plaintiffs contend that the Forest Service should have included more information about specific past projects. But plaintiffs do not identify any additional information about past projects that would have enhanced a reader's understanding of cumulative effects on sensitive species. For example, although plaintiffs fault the Forest Service for not cataloguing each past action, they do not explain why such a catalogue would be more meaningful than the Forest Service's discussion of the aggregate effects of those past actions. As explained, what is important is the lingering environmental effect of past actions, not the mere fact that

_____

[18]The data that the habitat tables summarize are explained in greater detail in the Biological Evaluation, R. 2068 at 24-44, and elsewhere in the project record, see id. at 6-7 (explaining how habitat models were developed and where underlying data are located).

[19]EIS at 3-86.

past actions have occurred. CEQ recognizes this in its guidance memorandum, which states that "[a]gencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined." CEQ 2005, supra, at 2.[20] Plaintiffs have not explained why more details about individual past projects would be necessary or meaningful.[21] Therefore, I conclude that the Forest Service's existing discussion is sufficient.

**(ii)    Discussion of present and reasonably foreseeable projects.**

Plaintiffs next argue that the Forest Service did not adequately discuss other contemporaneous and reasonably foreseeable forest projects in its cumulative effects analysis. Part of their argument is that the Forest Service should have discussed the effects of projects from outside of the defined cumulative-effects geographic area, including projects on the Nicolet side of the forest. However, as I have already explained in Part A.3.a, the Forest Service reasonably defined the geographic scope of its cumulative effects analysis. I discuss plaintiffs' remaining arguments below.

-------------------------------------------------

[20]When I decided the prior cases arising out of the CNNF, I did not have the benefit of the CEQ's guidance memorandum concerning past actions. Thus, I reached conclusions that are inconsistent with the memorandum, such as that an EIS must always include a catalogue of past actions. See, e.g., Habitat I, 363 F. Supp. 2d at 1082-83. In light of the CEQ's guidance, I conclude that a catalogue of past actions is not necessary unless the party challenging the EIS shows that such a catalogue is vital to the proper understanding of the present effects of past actions. The Ninth Circuit has also recently concluded that a catalogue of past actions is not required. League of Wilderness Defenders, __ F.3d at __, 2008 WL 5171345, at *5-6.

[21]In a supplemental filing relating to the League of Wilderness Defenders case, plaintiffs state that, as in that case, the Forest Service here failed to describe the "relevant past-timber-sale inputs" in the EIS. However, as indicated, the EIS describes the past actions that have affected the sensitive species (although it does not list each individual action), and analyzes the present effects of those actions. EIS at 3-92 to 3-93. In other words, the EIS discusses past-timber-sale inputs. To the extent that plaintiffs believe that the Forest Service has omitted anything significant from its discussion of past actions, they have not explained what that omission is and why it is significant. Rather, plaintiffs simply demand more detail.

## (a) Failure to consider "Twin Ghost" as reasonably foreseeable future project.

Plaintiffs argue that the Forest Service failed to consider a recently proposed project – the "Twin Ghost" project – in its cumulative effects analysis.[22]  If implemented, the Twin Ghost project will take place in a part of the forest that is directly adjacent to the Twentymile project.  The Forest Service concedes that it did not consider Twin Ghost when it analyzed cumulative effects for the Twentymile project.  However, the Forest Service contends that it did not have meaningful information about the details of the Twin Ghost project at the time that the Twentymile EIS was prepared (January 2007), or at the time when the Twentymile project was approved (February 2007).  Therefore, argues the Forest Service, it was not required to discuss the project in the Twentymile EIS.

As indicated, the CEQ regulations require that an EIS include a discussion of the environmental impact of the project when added to "other past, present and <u>reasonably foreseeable future</u> actions."  40 C.F.R. § 1508.7 (emphasis added).  The regulations do not define "reasonably foreseeable future actions."  However, courts have applied the "rule of reason" discussed above to the question of whether an agency should have discussed a particular future action in its EIS.  <u>See</u> <u>City of Oxford, Ga. v. Fed. Aviation Admin.</u>, 428 F.3d 1346, 1353-54 (11th Cir. 2005).  Thus, whether (and to what extent) the future action should have been discussed turns on the amount of discussion necessary to serve the two principal purposes of NEPA: ensuring informed decision-making and informed public participation.  <u>Id.</u>

In the present case, the Twentymile EIS was completed in January 2007, and the decision to implement the Twentymile project was made on February 12, 2007.  The timing

---

[22]Plaintiffs raised this argument for the first time after briefing on the pending motions for summary judgment was completed.  I asked the parties to submit supplemental briefs on this issue, which they have done.

with respect to the Twin Ghost project was as follows.[23]  In 2005, Forest Service staff began

to "think about" what types of management activity might be needed in the general vicinity of

what has now been identified as the Twin Ghost project area.  (Chaney Aff. ¶ 3.)  That is, it

began to study the project area to identify potential goals of a restoration project to be

conducted in the area at some point in the future.[24]  The first step in identifying goals is to

collect data from within the project area concerning the existing state of the vegetation,

wildlife, roads, and other resources.  The process of collecting this data can take years to

complete.  Only after this data has been collected can the Forest Service determine what

needs to be done to bring the area closer to its desired condition, as specified in the overall

Forest Plan for the CNNF.  Until all data has been collected and analyzed, the Forest Service

does not know what it will do to the project area.

The data collection process for the Twin Ghost project began in the spring and summer

of 2005 and was not completed until the fall of 2007 – i.e., well after the Twentymile EIS was

completed and the Twentymile project was approved.  In November 2007, the Forest Service

for the first time had a preliminary project boundary and an initial list of stands to consider for

inclusion in the project.  In January 2008 – a year after the Twentymile EIS was completed

– the Forest Service developed a list of goals for the Twin Ghost project.  In February 2008,

however, the Twin Ghost project was put on hold so that the Forest Service could concentrate

on other priorities.  The Forest Service refocused its attention on the Twin Ghost area in

October 2008, and for the first time notified the public that it was working on a proposal for

---

[23]The facts relating to the timing of the Twin Ghost project are taken from the Declaration of Constance Chaney, filed with the Forest Service's supplemental brief.

[24]An internal Forest Service email sent on June 30, 2005, indicates that a Twin Ghost proposal would be likely coming down the "timber pipeline."  This email was included in the administrative record for the Twentymile project.  R. 1709-1712.

the area. In November 2008, the Forest Service distributed information about the proposal to the public and solicited public comment. As of this date, the Forest Service continues to receive public comment about the proposal. No decision to implement the Twin Ghost project has yet been made, and no decision with respect to the project is anticipated until 2010, at the earliest.

Thus, at the time that the EIS for the Twentymile project was completed, the Forest Service had begun to think about initiating a project within the Twin Ghost area, but it had little information about what that project might entail. Presumably, the Forest Service knew that any project would involve cutting down some trees, but beyond this highly generalized notion, it had no information. Because no details about the Twin Ghost project had been identified at the time that the Twentymile EIS was prepared, the Forest Service did not mention Twin Ghost in the Twentymile EIS.

Applying the rule of reason, I find that the Forest Service's failure to discuss the possibility that a project within the Twin Ghost area might be initiated does not require invalidation of the EIS. Simply put, the Twin Ghost project was too inchoate to warrant discussion. No goals for the project had yet been formulated, and without any goals, the Forest Service could not have known what action it would take within the area. The Forest Service thus had no way of quantifying the possible environmental effects of the project. Again, the Forest Service probably knew that any project would involve some logging, but nothing convinces me that the inclusion of a generalized statement in the Twentymile EIS that "some logging" might be conducted in the Twin Ghost area at some point in the future would have meaningfully improved decision-making or public participation with respect to the Twentymile project. As the Ninth Circuit has recognized, although it is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be

given now, if not enough information is available to give meaningful consideration now, an agency decision may not be invalidated based on the failure to discuss an inchoate, yet contemplated, project. Environmental Protection Info. Ctr. v. United States Forest Service, 451 F.3d 1005, 1014 (9th Cir. 2006). To be sure, the Twentymile EIS would have been better had it at least notified decision-makers and the public that some action might take place in the Twin Ghost area in the near future, but I cannot say that the failure to include this information requires that the EIS be invalidated and re-done.

Although the EIS is not invalid because of its failure to discuss Twin Ghost, it is possible that the Forest Service will have to supplement the EIS pursuant to 40 C.F.R. § 1502.9© once the probable environmental impacts of Twin Ghost are discerned.[25] Twin Ghost is within the cumulative effects region for the Twentymile project, and any destruction of suitable habitat for sensitive species as part of Twin Ghost will affect the analysis of suitable habitat conducted for the Twentymile project. Thus, destruction of suitable habitat in the Twin Ghost area might seriously change the environmental landscape described in the Twentymile EIS; if so, the Forest Service would be required to supplement the Twentymile EIS. However, based on the present record, it appears that the Forest Service cannot yet quantify the likely effects of the Twin Ghost project because it does not yet know what, if anything, it will do in that area. If the Twin Ghost proposal progresses to a point where meaningful environmental effects can be quantified, and if those effects significantly alter the environmental landscape described in the Twentymile EIS, supplementation of the Twentymile EIS will be required.[26]

───────────────────

[25]The legal standards governing an agency's duty to supplement an EIS are discussed in Part A.5.a, below.

[26]It may be that the time to supplement is now. However, the Forest Service has represented that "the effects [of Twin Ghost] to various sensitive species have not yet been

**(b)    Remaining   arguments   regarding   present   and   reasonably foreseeable projects.**

The remainder of plaintiffs' argument is that the Forest Service should have included more details about the projects that it did consider.  However, for each species, the Forest Service describes the present and future projects that it included in its habitat models.  EIS at 3-87, 3-93 & 3-98.  The Forest Service then discusses the expected effect of the proposed project and its alternatives on the habitat of each species.  Id. at 3-88, 3-94, & 3-98 to 3-99. Finally, the Forest Service expresses the overall cumulative effect of each alternative on each species's habitat in tabular form.  Id. at 3-86, 3-91 & 3-97.[27]

Although the discussion in the EIS is succinct, I find that it is enough to enable a reader to evaluate the cumulative effect of each alternative on sensitive species.  The only meaningful effect is impact to habitat, and the tables adequately explain the cumulative effect to habitat under each alternative.[28]  Indeed, the tables pack a great deal of information into a small space.  If the Forest Service used words instead of tables to communicate the cumulative impacts of the various alternatives on habitat, the EIS probably would have been

_____

formally determined." (Docket Entry # 69 at 9.)  Plaintiffs have stated that they "do not have access to the Forest Service's records for Twin Ghost and, therefore, are not in a position to state with certainty what the environmental impacts of that project would be." (Docket Entry #70 at 10.)  Based on this record, I cannot conclude that Twin Ghost has already progressed to a point where supplementation is required.

[27]Again, the models and data summarized in the tables are included in the Biological Evaluation and elsewhere in the project record.  R. 2068 at 6-7 & 24-44.

[28]Plaintiffs seem to disagree with the Forest Service's tables.  They argue that the Forest Service fails to explain its conclusion that habitat will recover after five years. (Pls.' Br. in Supp. at 45.)  However, the EIS explains this conclusion.  For example, with respect to marten habitat, the EIS explains that losses to suitable habitat would be "outpaced by habitat additions through aspen stands reaching 40 years of age, and hardwood and birch stands reaching 50 years of age." EIS at 3-88.  In other words, although the project will remove some marten habitat, over the course of five years trees in untreated areas will reach an age that results in suitable habitat, whereas today the trees in those areas are too young to provide suitable habitat.

many pages longer and much less clear.  Nothing in NEPA, however, requires a federal agency to sacrifice clarity for length.  In any event, a reader who wanted to analyze the specific models and data summarized in the tables could do so by reviewing the relevant portions of the project record, which are cited in the EIS.  See id. at 3-83 (explaining where additional information regarding analysis methodology and findings can be found).  Therefore, I conclude that the EIS contains adequate information about the cumulative effects of present and future actions.

   **(iii) Discussion of projects on private land.**

   Plaintiffs also argue that the Forest Service failed to adequately account for logging activities on private land.  However, the EIS explains that after reasonable investigation, the Forest Service was unable to obtain satisfactory data about the impact of logging on private lands.  EIS at 3-92 to 3-93.  Therefore, the Forest Service utilized the "worst-case scenario," under which "private lands are assumed to provide no suitable habitat, even though many parcels do." Id. at 3-93.  In other words, the Forest Service followed a conservative approach and assumed that the only suitable habitat for sensitive species was located within the boundaries of the CNNF, meaning that any destruction of habitat within the CNNF was assumed to have the worst possible impact on sensitive species.  It is unclear why plaintiffs believe that the Forest Service's conservative approach violates NEPA, and I conclude that it does not.

   **c. Other issues relating to discussion of cumulative effects.**

   Plaintiffs argue that the Forest Service failed to adequately account for the cumulative effects of old-age aspen clear-cutting and logging in certain designated areas of the forest ("2B areas") on American Pine Marten, Northern Goshawk and Red-shouldered Hawk.

Plaintiffs point out that both old-age aspen and 2B areas are prime habitat for these sensitive species.

It is not clear how this argument is any different than plaintiffs' other arguments regarding the Forest Service's cumulative effects analysis. As explained, the EIS discusses impacts on species habitat through tables that express the percentage change in suitable habitat that is expected to be caused by the project and the cumulative effects of other past, present and future projects. These tables account for all forest management activity within the cumulative effects region, and therefore they include the effects of aspen clear-cutting and harvesting of 2B areas within such region. Plaintiffs do not explain how a more specific analysis of clear-cutting and management of 2B areas would add meaning to the overall discussion. They do not, for example, describe any cumulative effects that these actions might cause that the Forest Service is ignoring.[29] Therefore, I conclude that its discussion of cumulative effects is adequate.

### 4.    Consideration of Scientific Information.

Agencies "shall discuss at appropriate points in the final statement any responsible opposing view . . .  and shall indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9(b). "This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." Ctr. for Biological Diversity v. Forest Service, 349 F.3d 1157, 1167 (9th Cir. 2003) (citing 40 C.F.R. at § 1500.1(b)).  If the

_____

[29]Plaintiffs include one sentence in their brief in which they assert that the Forest Service has ignored the relationship between aspen clear-cutting and the deer population. However, the EIS discusses this issue and explains why the Forest Service thought that the impact on deer population was only a minor issue that did not warrant detailed study.  EIS at 1-22 to 1-23.

information opposes the agency's conclusions, the agency must make "a good faith reasoned response to it." Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994).

Plaintiffs argue that the Forest Service ignored scientific evidence showing that American Pine Marten, Northern Goshawk, and Red-shouldered Hawk are in decline in the CNNF. But the Forest Service devoted an entire section of the EIS to evaluating the project's effect on sensitive species "that are declining in population or habitat . . . or whose population or habitat is stable but limited," including marten, goshawk and red-shouldered hawk. EIS at 3-83. In other words, one of the key environmental consequences that the Forest Service studied in detail was the project's effect on sensitive species. To say that the Forest Service ignored scientific evidence that these species are sensitive or declining is to ignore over twenty-five pages of the EIS, which assume that such species need to be protected. In any event, the EIS discusses the "existing condition" of each species within the CNNF, citing scientific evidence to support the Forest Service's conclusions. Id. at 3-84, 3-89 & 3-95. I can identify no scientific evidence that the Forest Service ignored without reasonable justification. Indeed, Appendix H to the EIS contains the Forest Service's detailed responses to public comments, including almost twenty pages devoted to technical and scientific criticisms leveled by plaintiffs. EIS at H-18 to H-46.

Plaintiffs argue that the Forest Service ignored a comment by one of its own scientists about the EIS, in which he stated that the EIS does not adequately address the impact of winter logging activity on goshawk foraging behavior. R. 2343 to 2344. However, this comment appeared in a document listing "discussion points" about goshawks in the project area, and the author himself described his comments as a "mental tease." R. 2343. The comment was not the product of a formal scientific study but was more of an off-the-cuff

remark. NEPA does not require agencies to answer every single comment made by a scientist with respect to a proposed agency action. Those that are speculative or divorced from the scientific method may be ignored. The cited comment is of the latter variety, and therefore the Forest Service had no obligation to discuss it in the EIS.[30]

### 5.     Failure to Supplement EIS to Incorporate New Information.

Plaintiffs' last NEPA argument is that the Forest Service should have prepared a supplemental EIS after it learned that, contrary to its conclusion in the original EIS, American Pine Marten do inhabit a portion of the Twentymile project area. In the original EIS, the Forest Service reviewed data collected from field-surveys conducted within the project area in 2005 and concluded that there was no occupied marten territory in the area. In the summer of 2007, however, a new field survey revealed that marten did inhabit trees on the very edge of the project area. This discovery led the Forest Service to conclude that marten occupied two hardwood stands totaling about 78 acres (or 0.8% of the project area) on the edge of the project area. Although the Forest Service did not then prepare a supplemental EIS, it did prepare a document entitled "Review of New Information Relating to American Pine Marten," in which the significance of the discovery was discussed. Further, the Deputy Forest Supervisor prepared a "Supplemental Information Report" ("SIR"). In the SIR, the deputy supervisor explained that the Forest Service would, as a mitigation measure, defer harvesting within the two occupied stands, and that with this modification, the environmental effect of the Twentymile project on marten would be the same as described in the original EIS. Therefore,

---

[30]In addition, the comment relates to the effect of the project on goshawk foraging territory, and the Forest Service responded to a number of other comments about this issue. EIS at H-12 to H-13 (resp. to cmts. 5 & 6); H-31 to H-32 (resp. to cmt. 21). Thus, this is not something that the Forest Service ignored altogether.

concluded the deputy supervisor, no supplemental EIS would be prepared. Plaintiffs challenge the decision not to prepare a supplemental EIS.

### a. Standard of review.

Plaintiffs incorporate their contention that the Forest Service must supplement the EIS because of the discovery of occupied marten territory into some of their other arguments, including arguments made under NFMA. However, at oral argument, when asked what the Forest Service should have done after it discovered occupied marten territory, plaintiffs responded that the Forest Service should have prepared a supplemental EIS. Therefore, I analyze plaintiffs' argument pursuant to the legal standards governing an agency's decision not to supplement an EIS.

NEPA does not address whether an agency must supplement an EIS. Marsh, 490 U.S. at 370. However, CEQ regulations impose a duty on all federal agencies to supplement an EIS when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). In discussing the standard of judicial review of an agency's decision not to prepare a supplemental EIS, the Supreme Court has recognized that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Marsh, 490 U.S. at 373. However, "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." Id. at 374. In determining wether new information requires supplementation, courts are to apply a "rule of reason" that "turns on the value of the new information to the still pending decision-making process." Id. Because the environmental significance of new information is normally a question of fact that implicates substantial agency expertise, the court must defer to "the informed discretion of the responsible federal agencies." Id. at 376-77 (internal quotation

marks omitted). In applying this standard of review, a court must ensure that the agency "conducted a reasoned evaluation of the relevant information and reached a decision that, although perhaps disputable, was not 'arbitrary or capricious.'" Id. at 385.

The Seventh Circuit, in a decision that predates Marsh, set out a similar standard of review. Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984). That court also noted that the decision on whether to supplement an EIS "is made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action [i.e., the original EIS]." Id. at 418. Thus, the "principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS." Id. "The issue is whether the subsequent information raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary." Id. Again, whether the new information raises such concerns is entitled to some deference. Id. Therefore, "an agency cannot have acted arbitrarily or capriciously in deciding not to file a [supplemental EIS] unless the new information provides a seriously different picture of the environmental landscape such that another hard look is necessary." Id. (emphasis in original).

### b. Application to facts.

In the present case, the Forest Service reacted to the discovery of marten in the project area by preparing an analysis of its significance. The analysis found that the new information did not change the EIS's discussion of impact to marten habitat, and that the only concern raised by the new information was impact to a few individual marten. The conclusion of the analysis was that harvesting within the occupied stands would result in a more severe impact

on the actual marten population within the forest than indicated in the original EIS because the forest's marten population was highly sensitive , and the loss of even a few marten would thus cause a significant negative impact.  However, the analysis also concluded that if the Forest Service did not harvest trees within the occupied territory, the impacts to marten would be the same as stated in the original EIS.  This would be so because if no harvesting occurred within the occupied territory, the individual marten would not be affected by the project, and the EIS's conclusions with respect to all other environmental effects would remain unchanged. The Twentymile proposal will also leave unharvested "extensive areas of suitable habitat . . . adjacent to the [occupied] territory." (Review of New Information Relating to American Pine Marten, at 3.)  Based on this analysis of the new information, the Forest Service issued the SIR, in which it explained that it would not prepare a supplemental EIS but would not harvest within the occupied stands.

Plaintiffs do not dispute the Forest Service's conclusion that the discovery of occupied marten territory did not change any of the EIS's conclusions regarding impact to marten habitat, as opposed to impact on individual marten.  Further, plaintiffs do not challenge the Forest Service's conclusion that the deferral of harvesting within occupied stands will mitigate the impact on the specific marten within those stands.  However, plaintiffs argue that the discovery of occupied marten territory shows that the Forest Service must have been relying on inaccurate data when discussing the impact of the project on marten throughout the project area in the original EIS.  (See Pls.' Reply Br. at 25-26.)  Their argument is that because the Forest Service has discovered marten in a small portion of the project area, it must conduct a fresh survey of the entire project area to determine whether there is more occupied marten territory to be found.

The problem with the plaintiffs' argument is that whether the discovery of occupied marten territory casts doubt on the Forest Service's conclusion that the rest of the project area is unoccupied is a question of technical expertise, and plaintiffs have not shown that the Forest Service's resolution of this technical question was arbitrary or capricious. It may be that the Forest Service's survey of the project area was highly accurate, that even the most accurate field survey may overlook some occupied territory, and that the discovery of some occupied territory within 0.8% of the project area may not be cause to discard the existing analysis of the entire project area.[31] However, although it is plaintiffs' burden to show that assumptions and conclusions within an EIS are arbitrary and capricious, Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995); N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1543 (11th Cir. 1990), plaintiffs offer nothing other than their own bald assertion to support the notion that the finding of occupied territory "strongly suggests" that the Forest Service's initial analysis was flawed. (Pls.' Reply Br. at 25-26.) Of course, plaintiffs' unsupported assertions cannot establish that new information presents a "seriously different picture of the environmental landscape such that another hard look is necessary."[32] Weinberger, 745 F.2d at 418. Therefore, I conclude that the discovery of occupied marten territory does not require

_____

[31]Although I am certainly no expert on the detection of American Pine Marten, some scientific literature that I have found suggests that detecting marten is a highly technical endeavor, and that even the best methodology will not be 100% accurate. William J. Zielinski & Howard B. Stauffer, Monitoring Martes Populations in California: Survey Design & Power Analysis, 6 Ecological Applications 1254, 1256 (1996) ("Despite our current belief in the efficacy of the detection method [described in this article], too little is known about forest carnivores to assume probabilities of detection are near 100%.").

[32]In addition, I note that the original EIS acknowledges that there was "some uncertainty regarding marten use of the [project] area," EIS at 3-88, and that the environmental landscape described in the EIS thus includes the possibility that unknown, occupied marten territory might exist in the project area. This acknowledgment lessens the degree to which the discovery of actual marten changes the environmental landscape described in the EIS.

supplementation of the EIS, and that the Forest Service has adequately explained why its mitigation measure was a sufficient response to the discovery.

**B.    NFMA**

In addition to NEPA, plaintiffs challenge the Twentymile project under NFMA, which directs the Secretary of Agriculture to develop a Land and Resource Management Plan ("Forest Plan") for each of the national forests. 16 U.S.C. § 1604. All site-specific projects (such as the Twentymile project) must be consistent with the governing forest plan. 16 U.S.C. § 1604(i). The operative plan for the CNNF was adopted in 2004. The Secretary of Agriculture has promulgated regulations under NFMA, which are codified at 36 C.F.R. pt. 219. These regulations were amended in 2000, but the 2004 CNNF Forest Plan was developed under the 1982 version of Part 219. The parties agree that the 1982 version governs this case.

Because NFMA does not contain a private right of action, plaintiffs' NFMA claims must be analyzed under the APA. Indiana Forest Alliance, Inc. v. United States Forest Service, 325 F.3d 851, 862 (7th Cir. 2003). Thus, as under NEPA, my only role is to ensure that the Forest Service took a hard look at the relevant NFMA issues in making its decision and did not act arbitrarily or capriciously. Id.

**1.    Consistency with Forest Plan.**

Plaintiffs' briefly argue that the Twentymile project is inconsistent with the 2004 CNNF Forest Plan because it undermines the Forest Plan goal of improving habitat for sensitive species. (Pls.' Br. in Supp. at 57-59.) However, as explained above, the Forest Service has fully considered the effect of the project on sensitive species, and has concluded that the selected alternative best serves the project's seven objectives. Those seven objectives were formulated to bring the Twentymile area closer to its desired condition as specified in the

Forest Plan. Plaintiffs disagree with the Forest Service's conclusion that the chosen alternative is the best way to achieve those objectives, but I can identify nothing that is arbitrary or capricious in the Forest Service's reasoning process. Therefore, I cannot conclude that the project is inconsistent with the Forest Plan.

## 2. Viability of Sensitive Species.

Plaintiffs' chief NFMA argument is that the Forest Service violated regulations requiring it to identify, monitor and evaluate populations of Management Indicator Species ("MIS"). 36 C.F.R. § 219.19 (1999). MIS are "plant and animal species . . . selected for emphasis in planning, and which are monitored during Forest Plan implementation to assess the effects of management activities on their populations and the populations of other species with similar habitat needs which they might represent." EIS at 3-152. They are "meant to be used to estimate the effects of Forest Plan alternatives on fish and wildlife populations, as well as a means of monitoring and evaluating the effects of Plan activities during implementation." Id. The list of such species in the CNNF includes American Pine Marten, Northern Goshawk, and Red-shouldered Hawk.

To comply with the NFMA regulations, the Forest Service monitors MIS population trends at the level of the entire CNNF. EIS at 1-31. At issue in the present case is the Forest Service's actions at the project level. At this level, the Forest Service does not monitor population trends directly but calculates the amount of suitable habitat for each species based on scientific modeling. These habitat models serve as a proxy for actual population counts at the project level. As I discussed in the context of cumulative effects, the Forest Service assesses the impact of a project (or the cumulative impact of a series of projects) on a species by modeling the impact of the project (or series of projects) on suitable habitat. The Seventh Circuit has approved the use of habitat models as a means of monitoring MIS, and

a court is required to uphold the conclusions drawn from such models unless the methodologies underlying them are irrational.  Indiana Forest Alliance, 325 F.3d at 863; Marita, 46 F.3d at 621.

In the present case, the Forest Service utilized the following methodology to determine impact on MIS.  First, as explained in the Biological Evaluation, the Forest Service collected and reviewed scientific information to identify relevant habitat factors for each species.  R. 1736, 2244 to 2269.  The habitat models focus on three variables: forest type, age of the stand, and canopy cover.[33]  These factors were used to quantify existing habitat for each species and to project the impact of each project alternative on suitable habitat.    In making its projections, the Forest Service subtracted habitat that would be rendered unsuitable by project activities (including other projects within the cumulative effects area), assessed how much time would elapse before the damaged habitat regenerated, and analyzed whether presently unsuitable areas would become suitable habitat due to the natural effects of forest aging.  It then computed the totals and expressed the projected impact to suitable habitat in tabular form.  This methodology is not irrational.

Plaintiffs argue that the Forest Service's methodology is flawed for a number of highly technical reasons.  However, as explained above, the general methodology is rational, and although the plaintiffs' preferred methodology may, in their view, be superior science, it is not the court's function to decide which methodology is superior, nor does it have the technical

_____

[33]Plaintiffs criticize the Forest Service for focusing on only these three variables to the exclusion of other variables, such as "large woody debris" or "LWD."  However, the EIS explains why the Forest Service limited its inquiry to the three variables, which is that those variables serve as a rough proxy for the larger suite of variables, including LWD.  R. 8387, at H-28 (response to cmt. 18).  The Forest Service acknowledges that the correlation between the chosen variables is not perfectly linear, but that scientific literature shows that the variables are positively correlated.  Id.  This discussion is enough to show that the selection of variables was not irrational.

expertise required to do so.  See Wildwest Institute v. Bull, 468 F. Supp. 2d 1234, 1248 (D. Mont. 2006) (refusing to entertain battle of experts over methodology used by Forest Service to comply with NFMA).  Again, only if the Forest Service's science is so bad that it is irrational may the court interfere.  Here, plaintiffs have not shown that the Forest Service's methodology is irrational, as opposed to merely imperfect.

Because the Forest Service's overall methodology is rational, I will not individually analyze every alleged technical flaw on plaintiffs' list.[34]  However, I will discuss what appears to be plaintiffs' main criticism, which is that the habitat models must be flawed because they show that the project area contains ample available habitat for marten, goshawk and red-shouldered hawk, yet the actual quantity of occupied habitat is minimal.  Plaintiffs argue that the lack of occupied habitat shows that the models must be overestimating the amount of available habitat.  Plaintiffs analogize the project area to a 500-room hotel in a busy tourist district that booked only one guest per night – something about the hotel rooms must not be "suitable."  But the Forest Service points out the flaw in this analogy, which is that the Twentymile project area is not a busy tourist district for these species.  Rather, the area is at the very edge of goshawk and red-shouldered hawk range, and marten have been extirpated from the region and have only recently been reintroduced through small, artificial releases. See R. 2098 to 2099 (describing goshawk range), R. 2108 to 2109 (describing red-shouldered hawk range and concluding that red-shouldered hawk was probably never common in Wisconsin); EIS at 3-87 (explaining that existing population of marten in CNNF descended from small releases by Wisconsin Department of Natural Resources).  Thus, it is not

_____

[34]In its responses to public comments in the EIS, the Forest Service responds to most of plaintiffs' technical criticisms, explaining why the Forest Service made the choices that it did.  See, e.g., EIS at H-28 to H-29, response to cmt. 18.

reasonable to expect that much of the suitable habitat for these species would be occupied, and the fact that it is not does not mean that the Forest Service's methodology is flawed, much less irrational. Therefore, I cannot conclude that the Forest Service failed to take a hard look at the relevant NFMA issues in making its decision or acted arbitrarily or capriciously. Indiana Forest Alliance, 325 F.3d at 862.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED** and that plaintiffs' motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that parties' motions to file briefs exceeding the District's page limitations (docket entries 53 & 57) are **GRANTED**.

**FINALLY, IT IS ORDERED** that the clerk of court enter final judgment.

Dated at Milwaukee, Wisconsin, this 12 day of January, 2009.


/s_____
LYNN ADELMAN
District Court Judge